

14 CV 6389

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
:
United States of America,               :
:
-v-                         :        Case No. 133-106 (1950)
:
:        Oral Argument Requested
Abraham Brothman and Miriam Moskowitz,   :
:
Defendants.                   :
:
-------------------------------------------------------------X

## PETITION FOR WRIT OF ERROR *CORAM NOBIS*

Petitioner Miriam Moskowitz respectfully submits this petition for a writ of error *coram nobis* pursuant to the All Writs Act, 28 U.S.C. § 1651; *see, e.g., United States v. Denedo*, 556 U.S. 904 (2009). Ms. Moskowitz, now 98 years old, files this exceptional petition because her McCarthy-era prosecution and conviction in 1950 represents an "error of the most fundamental character," which "rendered the proceeding itself irregular and invalid." *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996). The profound injustice of Ms. Moskowitz's felony conviction represents exactly the type of "fundamental error" that only the writ of error *coram nobis* can redress, and is a prime example of the "extraordinary cases presenting circumstances compelling its use to achieve justice." *Denedo*, 556 U.S. at 911 (internal quotation marks omitted).

**PREET BHARARA**
United States Attorney, **SDNY**



In 1947, Abraham Brothman and his associate Harry Gold were questioned by the FBI in connection with allegations that they were involved in atomic espionage. Miriam Moskowitz, Abraham Brothman's secretary at the time, was questioned as well. Three years later, Ms. Moskowitz was indicted for conspiring with Brothman and Gold to lie to a grand jury convened to investigate the allegations of espionage.

Harry Gold repeatedly told the FBI that Ms. Moskowitz was unaware of Gold and Brothman's plan to straighten out their stories before the grand jury. After the Government threatened him with the death penalty, Gold cooperated and testified against Ms. Moskowitz at her trial, saying that she was present while Brothman and Gold discussed their plan to lie to the grand jury.

Over the past sixty-four years, the fundamental error of Ms. Moskowitz's criminal conviction has become even more apparent and inescapable. First, it has come to light that the Government withheld critical and exculpatory evidence for nearly sixty years. Second, the jury was undeniably affected by the prevailing sentiments of the McCarthy era, making it impossible during that time for Ms. Moskowitz to have received an objectively fair trial. Third, her former boss and employer, Abraham Brothman, saw his conviction for obstruction of justice reversed by the Second Circuit on the ground that venue did not lie in the Southern District of New York. *United States v. Brothman*, 191 F.2d 70 (2d Cir. 1951). Despite the fact that the substantive count against her codefendant was reversed by the appellate court, Ms. Moskowitz served two years' imprisonment, paid a $10,000 fine, and continues to live under the cloud of her unjust felony conviction.

## I. LEGAL STANDARD

A writ of error *coram nobis* is the sole remaining form of post-conviction relief available to Ms. Moskowitz. *Fleming v. United States*, 146 F.3d 88, 89-90 (2d Cir. 1998) ("*Coram nobis* is essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus."). District courts are empowered to issue a writ of error *coram nobis*, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), "under circumstances compelling such action to achieve justice." *United States v. Morgan*, 346 U.S. 502, 511 (1954). The Supreme Court acknowledged that a writ may still issue even after a sentence has been served because, "[a]lthough the term has been served, the results of the conviction may persist." *Morgan*, 346 U.S. at 512; *see also Nicks v. United States*, 955 F.2d 161, 167 (2d Cir. 1992) (The district court may issue a writ of error *coram nobis* where "extraordinary circumstances are present."). The petition is appropriately heard by the district court in which the conviction was obtained. *Id.* Appellate leave is not required for a trial court to correct errors occurring before it. *Standard Oil of California v. United States*, 429 U.S. 17 (1976).

The standard for granting a petition for writ of error *coram nobis* requires that the petitioner "demonstrate that 1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Foont*, 93 F.3d at 79 (internal citations omitted).

## II.  NEW FACTS AND MANIFEST LEGAL ERROR

Ms. Moskowitz was convicted of conspiring to obstruct justice even though her alleged co-conspirators, Harry Gold and Abraham Brothman, admitted she was never part of their conspiracy to lie to the grand jury.  It was manifest legal error for Harry Gold's irreconcilable statements to the FBI and testimony before the grand jury to be hidden from the defense for nearly sixty years, particularly when that testimony and those statements go directly to whether Ms. Moskowitz knew of and assented to a conspiracy.

At trial, Harry Gold, the Government's only witness against Ms. Moskowitz, testified that she was present when he relayed to Brothman the fictitious story he told the FBI agents.  (Trial Tr. 650-51, annexed as Ex 1 to the Declaration of Guy Eddon ("Eddon Decl.").)  However, the grand jury minutes as well as the FBI's own reports, which under less antiquated laws would have been produced to the defense, reveal that Harry Gold lied at trial.  *See Jencks v. United States*, 353 U.S. 657, 672 (1957) (reversing criminal conviction on the ground that the Government denied defendants the opportunity to inspect and move for admission in evidence of "relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at the trial"); *Brady v. Maryland*, 373 U.S. 83 (1963).  But that information was concealed from the defense throughout Moskowitz's prosecution, conviction, and sentencing, and revealed only recently.

Based upon these new facts—facts that were not available to Ms. Moskowitz or the Court at the time of trial but that were available to the Government throughout—the only just and fair outcome of this matter would be for the Court to grant the writ of error *coram nobis*, thereby voiding Ms. Moskowitz's felony conviction.  As the Second Circuit noted in 1951, "[t]he case against [Ms. Moskowitz and her codefendant] was made largely by the testimony of [Harry]

4

Gold." *Brothman*, 191 F.2d at 71. Gold's testimony would have been severely undermined by the evidence that the government worked so hard to keep from the defense, the judge, and the jury.

It was not until nearly sixty years later, when Judge Hellerstein unsealed the Brothman/Moskowitz grand jury minutes due to their "substantial historical importance," that the fundamental conflicts between Harry Gold's statements heard by the grand jury and the testimony he gave at Ms. Moskowitz's trial became apparent. *In re National Security Archive*, Case No. 08-cv-6599, 2008 WL 8985358 (S.D.N.Y. Aug. 26, 2008). Indeed, even in 2008, the Government adamantly opposed the release of the Brothman/Moskowitz grand jury minutes. *Id.*, Gov't's Mem. of Law in Partial Opp'n to the Pet. for the Release of Grand Jury Records.[1] Due to Judge Hellerstein's order, the complete record of the Brothman/Moskowitz grand jury testimony from 1947 through 1950 is now publicly available at the National Archives.[2] These grand jury minutes, in which Gold repeatedly confesses to fabricating testimony, constitute the same evidence that was concealed from Ms. Moskowitz in 1950. *Brothman*, 93 F. Supp. at 368. In Harry Gold's own words, "I lied desperately." (Trial Tr. 924, Eddon Decl., Ex. 5.)

To the FBI, Harry Gold said that he "recalls telling BROTHMAN *practically nothing in MOSKOWITZ' [sic] presence* but later, after all had returned to the laboratory and *MOSKOWITZ had gone out for coffee or something*, they [Brothman and Gold] talked of their stories to the agents." (FBI Report by Special Agent in Charge Edward Scheidt, File No. 100-96341 at 9, Jul. 27, 1950, Eddon Decl., Ex. 2 (emphasis added).) "With regard to MIRIAM MOSKOWITZ, GOLD stated that *he never discussed* his espionage activity in her presence when he could avoid

---

[1] The Government's brief was a partial opposition because, although the Government completely opposed the release of the Brothman/Moskowitz grand jury minutes, it did not oppose the release of the Rosenberg grand jury minutes for certain witnesses.
[2] *Available at* http://www.archives.gov/research/court-records/brothman-moskowitz-jury.html.

it, as he distrusted her because of her violent temper. He felt that someday after one of the many arguments she always was having with BROTHMAN she would, out of spite, go to the authorities and report them. Also, MOSKOWITZ made him uncomfortable and unhappy, and he stayed away from her." (FBI Memo of Special Agent Thomas H. Zoeller, File No. 65-15324 at 8, Nov. 7, 1950, Eddon Decl., Ex. 3 (emphasis added).) "GOLD believes that MOSKOWITZ dislikes him ..." (*Id.*)

In statements taken only months earlier, Harry Gold similarly stated that "[w]hen Moskowitz went out on an errand, possibly to obtain some coffee, I related to Brothman in detail the [fictitious] story that I had told Agents Shannon and O'Brien." (Grand jury testimony of FBI Special Agent Thomas J. Donegan taken July 25, 1950 at 8965-67, reading Harry Gold's July 11, 1950 statement to the FBI, Eddon Decl., Ex. 4.) Harry Gold even said that he "told Abe [Brothman] at this time that no one knew of any of my other activities, and suggested to Abe that he should not mention any other activities of mine in front of anyone, particularly Miriam Moskowitz." (*Id.* at 8967.)

Harry Gold, the Government's key witness, changed his testimony at the trial just four months later, inculpating Ms. Moskowitz in Gold's conspiracy with Abraham Brothman to lie. But none of his prior statements or testimony was available to the defense. Had the jury seen and heard this key evidence, no reasonable jury could have believed Gold's later testimony against Ms. Moskowitz—and the Court conceded that Moskowitz's conviction was "made largely by" Gold's testimony. *Brothman*, 191 F.2d at 71. Without that recanted testimony, Ms. Moskowitz could never have been convicted.

### III.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Ms. Moskowitz was born in 1916 in Bayonne, New Jersey, to Hungarian immigrant parents.  (Moskowitz Decl. at ¶ 1.)  While working during the day and attending class at night, she earned a bachelor's degree in 1942 from City College (now the City College of New York).  (Moskowitz Decl. at ¶ 2.)  She subsequently worked for the U.S. Immigration and Naturalization Service, the War Manpower Commission, and then as a secretary at A. Brothman and Associates.  (Moskowitz Decl. at ¶ 3.)

### 1.  Miriam Moskowitz is subpoenaed by the grand jury.

On August 29, 1949, the Soviet Union successfully tested its first atomic bomb.  Against this backdrop, in July 1950, Miriam Moskowitz was subpoenaed to testify before a federal grand jury empaneled from July 22, 1947 through July 29, 1950 to investigate atomic espionage.  *United States v. John Doe*, Brothman/Moskowitz Grand Jury Transcripts. [3]  Abraham Brothman and his associate, Harry Gold, also testified before the grand jury in July 1947, and again in July 1950.  *Id.*  Ms. Moskowitz refused to cooperate with the Government's investigation (she and Brothman, a married man, were having an affair, and she declined to testify out of concern that the affair would be brought to light).  (Moskowitz Decl. at ¶ 4.)  Ms. Moskowitz invoked her constitutional right to remain silent before the grand jury and declined the Government's offer to testify against Brothman.  (Grand Jury Testimony of Miriam Moskowitz, Jul. 18 and 20, 1950, Eddon Decl., Ex. 6.)  Even had she been willing to cooperate, Ms. Moskowitz had no relevant testimony to offer because, as described above, both Gold's statements that were read to the grand jury and the FBI's own reports show that Ms. Moskowitz knew nothing of Brothman and Gold's plan to straighten out their story before the grand jury.

---

[3] *Available at* http://www.archives.gov/research/court-records/brothman-moskowitz-jury.html.

**2. Miriam Moskowitz is indicted for conspiracy to obstruct justice.**

Ms. Moskowitz was indicted on July 29, 1950. (Indictment, Jul. 29, 1950, Eddon Decl., Ex. 7.) Aside from the case caption, Ms. Moskowitz's name appears only once in the indictment, in the first sentence setting forth the charge of conspiracy to "obstruct and impede the due administration of Justice therein, in violation of Title 18, United States Code, Section 241 (1946 ed.)." (*Id.*) The remainder of the four page indictment concerns only Abraham Brothman and his unindicted co-conspirator, Harry Gold.

The arrests of Miriam Moskowitz and Abraham Gold on July 30, 1950 made national headlines. (Front page of the New York Daily News, Jul. 30, 1950, Eddon Decl., Ex. 8.)

Despite the fact that the indictment only repeats the language of the statute under which she was charged, on October 10, 1950, Judge Weinfeld denied Ms. Moskowitz's motion for a bill of particulars seeking, *inter alia*, "the substance of the testimony given by Harry Gold before the Grand Jury with respect to his associations with the defendants and divers other persons." *United States v. Brothman*, 93 F. Supp. 368, 370 (S.D.N.Y. 1950). Judge Weinfeld wrote:

> To grant [Ms. Moskowitz's] motion would require the Government to furnish its evidence to the defendants in advance of trial. Moreover, in view of the request for the testimony of Harry Gold before the Grand Jury, it would mean more than directing the filing of a bill of particulars. It would be tantamount to granting a partial inspection of the Grand Jury minutes. While the Court has the power to do so, it should rarely be exercised. No sufficient reason has been shown to justify it in this instance. The motion is denied in all respects.

*Id.* at 371.

Where a person is charged with conspiracy to obstruct justice by lying to a grand jury, the record of the testimony heard by the grand jury is a critical piece of evidence. *Dennis v. United States*, 384 U.S. 855, 872-75 (1966) (holding that, in a conspiracy case, where, as here, the testimony "concerned conversations and oral statements made in meetings" that were "largely

uncorroborated" and some of "the witnesses were accomplices" with "hostility toward [the defendants]," the defendants "were entitled to examine the grand jury minutes relating to trial testimony of the four government witnesses, and to do so while those witnesses were available for cross-examination.").

Not only did the court deny Ms. Moskowitz access to the exculpatory statements and testimony contained in the grand jury minutes, the Government proceeded to use portions of those same grand jury minutes in an attempt to incriminate Ms. Moskowitz by reading large swaths of Harry Gold's grand jury testimony to the jury at the opening of her trial. (Trial Tr. 314-349.) Ms. Moskowitz, by her attorney William Kleinman, continually objected to the use and reading of this grand jury testimony at the trial without the opportunity to review it beforehand:

> [Defense Attorney] MR. KLEINMAN:  I understand the Government's contention but what I say is this.  I should know in advance the nature of this testimony.  I should have the questions and answers before me.  The Government surely knows what they are.  They have transcripts of it.  I may have objection addressed to certain portion of that.  Maybe there was a question that was unanswered.  Maybe there was a question that was objectionable; but if we hear it for the first time in the presence of the jury and even if your Honor should direct the jury to disregard it, you know very well that it is extremely difficult to put out of one's mind what one hears.  All I wanted was this fair precaution of seeing what that testimony is and then addressing myself to your Honor in advance of the reading of it, so that you may make your rulings without any interruption from that point on.

(Trial Tr. 244, Eddon Decl., Ex. 9.)

## 3.  Ms. Moskowitz goes to trial.

Throughout the trial, in myriad ways that would be unfathomable today, the judge and the prosecutors revealed their political bias and motivation.  During a pretrial hearing on November 8, 1950, Judge Kaufman stated that "the basis of [the charge] is the undermining of

the security of the country. It is called obstruction of justice, subornation of perjury whatever they call it, and the basis of it is the security of the country was undermined." (Trial Tr. 22, Eddon Decl., Ex. 10.)

The jury was selected on Friday, November 10, 1950. During *voir dire*, the court asked:

> THE COURT:  Has any juror such prejudice or bias against the House Committee on Un-American Activities that it would so influence his judgment so that he or she would be unable to arrive at a just and honest verdict?  Have you formed or expressed any opinion concerning the work of that committee of Congress?

(Trial Tr. 77, Eddon Decl., Ex. 11.) One prospective juror, Schultz, responded: "I have felt for years that they were chasing red herrings, and recently I have been wondering whether I was right and which made my original judgment correct." (*Id.*) Judge Kaufman promptly dismissed Schultz from the panel. (*Id.*) Later in *voir dire*, the Court asked:

> THE COURT:  Has any member of the jury indicated support of the Communist Party at elections or otherwise, including the signature of any petition or resolution?  Has any member of the jury or did any member of the jury ever sign a petition of the Communist Party to nominate or elect Benjamin J. Davis[4] to a public office?

(Trial Tr. 101, Eddon Decl., Ex. 12.)

On Monday, November 13, 1950, the U.S. Attorney for the Southern District of New York, Irving Saypol, gave the opening statement for the Government:

> [U.S. Attorney Irving Saypol]  The charges of obstruction of justice, which we shall prove, are related mainly to the period between May 29, 1947 and July 31, 1947, a little over three years ago.  At that time in this district the grand jury was engaged in an investigation of violations of the law which condemn espionage, treason and subversive activities.

(Trial Tr. 156, Eddon Decl., Ex. 13.) And later:

> [I]n the course of the development of these facts you will hear evidence of activities in the interests of the Russian Government, of membership and

---

[4]  Benjamin Jefferson Davis, Jr. was an African-American lawyer and communist elected in 1943 to the New York City Council, representing Harlem.

affiliation and activities connected with and on behalf of the Communist Party. I repeat again, and I emphasize, that you must not lose sight of the main charges—obstruction of justice—in the evolution of the case as these matters about which I have just told you come out.

(Trial Tr. 159, Eddon Decl., Ex. 14.)  Saypol was assisted by 23-year-old "Confidential"

Assistant U.S. Attorney Roy Cohn.[5]

During the Government's closing argument on November 22, 1950, U.S. Attorney Irving

Saypol asked the jury:

> Was it ..., as the indictment charges, told to the grand jury by Brothman and Gold as part of a conspiracy between them and Moskowitz and others to cover up the true explanation of their association?  An association perhaps as part of an espionage apparatus supplying material to the Soviet Union?  And isn't the truth that Brothman's meetings with these people was in his capacity as a Communist, as a supplier of blueprints, documents and information, complete details of processes, for the use and benefit of the Soviet Union?  It matters not here whether that material was secret or classified—it was information of complete industrial processes.

(Trial Tr. 1075-76, Eddon Decl., Ex. 15.)  And later:

> As the Court will undoubtedly tell you, whether or not Brothman was giving the Soviet Union secret or confidential information, or whether Brothman was giving the Soviet Union established plans and processes which the Soviet Union wanted in the very form in which it was desired, is not the crux, of this case.  The charge here is obstruction of justice.  The obstruction of justice was perpetrated to retard an investigation of espionage to conceal the activities of these parties on behalf of the Soviet Union.

(Trial Tr. 1098-99, Eddon Decl., Ex. 16.)

---

[5]  In 1950, U.S. Attorney Irving Saypol appointed 23-year-old Roy Cohn his confidential assistant. http://www.fjc.gov/history/home.nsf/page/tu_rosenberg_bio_cohn.html.  Roy Cohn went on to work for Senator McCarthy and was later disbarred by a five-judge panel of the Appellate Division of the New York State Supreme Court for unethical and unprofessional conduct, including misappropriation of clients' funds, lying on a bar application, and pressuring a client to amend his will.  *Matter of Cohn*, 118 A.D.2d 15 (N.Y. App. Div., 1st Dept. 1986), *lv. denied*, 68 N.Y.2d 712 (N.Y. 1986).  Irving Saypol was indicted for bribery and perjury in 1976.

Following the reading of the court's charge, the jury began its deliberations at 3:40 PM.

After a break for dinner, the jury returned guilty verdicts against Miriam Moskowitz and her

codefendant Abraham Brothman.

Judge Kaufman addressed the jury:

> THE COURT:  Ladies and gentlemen, I want to thank you for your
> thorough and patient deliberations.  I think your verdict was an intelligent
> one and I think it was a proper verdict in accordance with the evidence in
> this case.  I think your verdict was a complete vindication, as far as I am
> concerned, of the jury system.
>
> What I do not understand and simply cannot fathom is why people who
> seek to undermine the very backbone of our country, why people seek to
> undermine that which gave them every opportunity—opportunity for
> education, opportunity for livelihood, yes, and an opportunity for a fair
> trial such as they have received here.  I simply cannot comprehend it.
> Perhaps the explanation can be found some place else but it is far beyond
> me.

(Trial Tr. at 1159, Eddon Decl., Ex. 17.)  Sentencing took place six days later, on Tuesday,

November 28, 1950.

Only a few months later, U.S. Attorney Irving Saypol and Assistant U.S. Attorney Roy

Cohn would prosecute Julius and Ethel Rosenberg for espionage before Judge Kaufman.  As

AUSA Cohn later acknowledged, "the Brothman-Moscowitz [sic] case was a dry-run of the

upcoming Rosenberg trial.  We were able to see how Gold and [Elizabeth] Bentley fared on the

stand, and we were able to see how *we* fared, [U.S. Attorney] Saypol and I." *The Autobiography

of Roy Cohn* at 61-62, Oct. 1, 1988 (emphasis in original).


## IV.  ARGUMENT

This case meets all three prongs of the test set forth in *Foont*: "1) there are circumstances

compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate

earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Foont*, 93 F.3d at 79 (internal citations omitted).

**1. Ms. Moskowitz's unjust conviction should be vacated in view of the compelling circumstances of this case.**

As set forth above, the circumstances of Ms. Moskowitz's conviction for conspiracy to obstruct justice evidence a profound injustice and the compelling circumstances required under the law for issuance of a writ of error *coram nobis*.

Ms. Moskowitz's wrongful conviction was driven, as the court concluded, by the testimony of Harry Gold, but the concealed Gold testimony and statements evidence that he lied. Further, the 1950 jury was undeniably biased against Ms. Moskowitz by the entirely unsupported statements of the judge and prosecutors linking her with "atomic espionage," treason, "subversive activities," and the Soviet Union, none of which were remotely relevant to the indictment. Moreover, the Second Circuit later reversed the substantive obstruction of justice conviction against her codefendant. As it stands, Miriam Moskowitz is a convicted felon, while the criminality of the underlying conduct has been strongly challenged. The compelling circumstances of Ms. Moskowitz's conviction are of the very sort for which a writ of error *coram nobis* is justified.

**2. Ms. Moskowitz has sound reasons for not seeking earlier relief.**

There has been no failure to seek appropriate earlier relief. It was not until late 2008 that the Brothman/Moskowitz grand jury minutes were made public by Judge Hellerstein's final order in *In re National Security Archive*, case no. 08-cv-6599, D.I. 8 (S.D.N.Y. Oct. 28, 2008). Ms. Moskowitz first recognized the conflicts between Harry Gold's grand jury testimony and his

later testimony at her trial while doing research for her book in 2010.[6]  (Moskowitz Decl. at ¶ 5.)
*See United States v. Reguer*, 901 F. Supp. 515, 517 (E.D.N.Y. 1995) (granting a writ of error
*coram nobis* for petitioner who pleaded guilty in 1988 and applied for writ in 1994).

**3.  Ms. Moskowitz suffers ongoing legal consequences from her unjust conviction.**

Ms. Moskowitz continues to suffer legal consequences from her conviction.  Ms.
Moskowitz has lived a lifetime in the shadow of her felony conviction.  (Moskowitz Decl. at
¶ 7.)  Not surprisingly, the impact of her conviction is manifest in all aspects of her personal and
professional life.  (*Id.*)  Ms. Moskowitz never married nor had children, an outcome she
attributes largely to her conviction.  (*Id.*)  After serving her two-year sentence, FBI agents
repeatedly harassed Ms. Moskowitz at her workplace, which resulted in her termination.
(Moskowitz Decl. at ¶ 8.)  For decades thereafter, Ms. Moskowitz felt the need to keep a low
profile in both professional and social settings so as not to draw attention to herself.  (Moskowitz
Decl. at ¶ 9.)  Ms. Moskowitz has also felt repercussions of her conviction within her religious
community.  (*Id.*)

Ms. Moskowitz also continues to suffer lost civil rights as a result of her felony
conviction.  She is ineligible to serve as a federal or state juror in her home state of New Jersey.
28 U.S.C. § 1865(b)(5) and N.J.S.A. § 2B:20-1(e).  Ms. Moskowitz's inability to serve on a jury
and other diminished civil rights that flow from her felony conviction warrant grant of a writ of
error *coram nobis*.  *United States v. Travers*, 514 F.2d 1171, 1172 (2d Cir. 1974) (citing civil
consequences of felony convictions as basis for grant of *coram nobis*).

---

[6]  Indeed, Ms. Moskowitz first learned that a petition for writ of error *coram nobis* could be filed when a filmmaker
working on a documentary about her life contacted attorneys to look into her case earlier this year.  (Moskowitz
Decl. at ¶ 6.)  Since then, Ms. Moskowitz has moved expeditiously to obtain counsel to file this petition on her
behalf.

The $10,000 fine Ms. Moskowitz paid in 1950, equivalent to nearly $100,000 today[7], together with lost job opportunities have caused Ms. Moskowitz economic hardship her entire life. While the Court cannot undo more than sixty years of economic adversity, vacating the conviction and fine will help alleviate some of that distress particularly since, having never married, Ms. Moskowitz has always had to support herself. *See Dean v. United States*, 436 F. Supp. 2d 485, 489 (E.D.N.Y. 2006) (granting writ of error *coram nobis* on basis of petitioner's "economic hardship").

By this petition, the Court has the opportunity to correct a miscarriage of justice from the McCarthy era, of which Ms. Moskowitz is perhaps the last living victim. Now is the time, before it is too late, to correct this historical wrong by vacating the conviction of Miriam Moskowitz.

---

[7] U.S. Dept. of Labor, Bureau of Labor Statistics, Consumer Price Index ("CPI") inflation calculator. *Available at* http://data.bls.gov/cgi-bin/cpicalc.pl.

**RELIEF SOUGHT**

WHEREFORE, Petitioner requests: (1) An order vacating Miriam Moskowitz's

conviction and (2) such other relief this Court deems just.


Dated: August 11, 2014

_____

Guy Eddon
    GE 2178
    e-mail:  Guy.Eddon@BakerBotts.com
Robert L. Maier
    RM 2930
    e-mail:  Robert.Maier@BakerBotts.com
Joseph C. Perry
    JP 3199
    e-mail:  Joseph.Perry@BakerBotts.com

Baker Botts LLP
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: 212.408.2556
Facsimile: 212.259.2556

*Attorneys for Miriam Moskowitz*