UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/9/14

------------------------------------------------------------------ x

MIRIAM MOSKOWITZ,

                Petitioner,

   -against-

UNITED STATES OF AMERICA,

                Respondent.

------------------------------------------------------------------ x

**ORDER AND OPINION
DENYING PETITION FOR
A WRIT OF ERROR
*CORAM NOBIS***

14 Civ. 6389 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Miriam Moskowitz petitions for a writ of error *coram nobis* to overturn her 1950

jury conviction for conspiracy to obstruct justice. Moskowitz's prosecution arose from an

investigation into Soviet nuclear espionage into the Manhattan Project and related activities by

which the United States developed atomic bombs. The investigation was capped by the

prosecution and execution of Julius and Ethel Rosenberg for spying. Moskowitz, then 34 years

old and now 98, contends that her conviction should be overturned based on recently unsealed

grand jury testimony which, had it been disclosed, could have changed the outcome of her trial.

For the reasons discussed in this opinion, Moskowitz's petition is denied.

## BACKGROUND

        Miriam Moskowitz's conviction relates to a series of events that occurred during a

1947 FBI investigation into Soviet espionage activities. Harry Gold, a chemist, had been secretly

couriering information about the Manhattan Project from Klaus Fuchs, a British theoretical

physicist, to Soviet agents. On May 29, 1947, FBI agents interviewed Gold and his colleague

Abraham Brothman, a chemical engineer, as part of their espionage investigation. That night,

after the interviews, Gold and Brothman met and considered how to reconcile inconsistencies in

their stories. Moskowitz, who worked as Brothman's secretary and was romantically involved

1

with him as well, was present at these conversations, according to Gold. Allen Decl. Ex. 1, at 650-51 (Transcript of Gold Testimony) ("Transcript"). Weeks later, Brothman and Gold were subpoenaed to testify before the investigating grand jury. According to Gold, Moskowitz helped persuade Brothman to stick to the original, untruthful story he gave the FBI during his grand jury testimony. *Id.* at 669-70 ("Miriam told me that she . . . had succeeded in persuading Abe from his desire to . . . change the original story which he had given the agents of the FBI . . ."). Gold also described other conversations about lying to law enforcement during which Moskowitz was present or provided encouragement.

Harry Gold ultimately pled guilty to violating the Espionage Act of 1917 and was sentenced to 30 years imprisonment, of which he served 14. Brothman and Moskowitz were each charged with conspiracy to obstruct justice in violation of 18 U.S.C. § 241 (1946 ed.).[1] They were tried together and convicted by jury. Each was sentenced to two years imprisonment and fined $10,000 on the conspiracy counts. The following year, the Second Circuit rejected Moskowitz's appeal, including a challenge to the sufficiency of the evidence, finding that "[a]n examination of the record convinces us beyond a reasonable doubt that the contention is groundless." *United States v. Brothman et al.*, 191 F.2d 70 (2d Cir. 1951). Moskowitz served her custodial sentence and paid her fine.

In a separate proceeding in 2008, I unsealed the minutes of the grand jury convened in the Brothman/Markowitz investigation, finding that they had substantial historical importance. *In re National Security Archive*, Case No. 08-cv-6599, 2008 WL 8985358 (S.D.N.Y. Aug. 26, 2008). Moskowitz now argues that three statements in particular also have relevance to

---

[1] In addition to conspiracy, Brothman was charged with, and convicted of, obstruction of justice. He was sentenced to five years and fined $5,000 on that count, but that conviction was reversed for improper venue because the grand jury to which Brothman had lied had been empaneled in the Eastern District of New York. *United States v. Brothman et al.*, 191 F.2d 70 (2d Cir. 1951).

2

her case. First, in a statement of July 11, 1950, Gold described the events of May 29, 1947. Gold, Brothman and Moskowitz had returned to the laboratory around 10:30 pm from their dinner at a Chinese restaurant. Gold reportedly told the FBI that, "[w]hen Moskowitz went out on an errand, possibly to obtain some coffee, I related to Brothman in detail the story that I had told Agents Shannon and O'Brien." Allen Decl. Ex. 2, at 8965-66 (July 25, 1950 Grand Jury Testimony of Special Assistant Attorney General Thomas J. Donegan) ("Donegan Testimony"). Second, an FBI report by Special Agent Louis Leuders, which was read into the record, notes that "GOLD recalls telling BROTHMAN practically nothing in MOSKOWITZ' presence but later, after all had returned to the laboratory and MOSKOWITZ had gone out for coffee or something, they talked of their stories to the agents." Allen Decl. Ex. 6, at 9 (Feb. 3, 1954 report of Special Agent Louis M. Leuders) ("Leuders Report"). Finally, a separate FBI report by Special Agent Thomas Zoeller, also read into the record, states that "[w]ith regard to MIRIAM MOSKOWITZ, GOLD stated that he never discussed his espionage activity in her presence when he could avoid it, as he distrusted her because of her violent temper. He felt that someday after one of the many arguments she was always having with BROTHMAN she would, out of spite, go to the authorities and report them." Allen Decl. Ex. 5, at 8 (November 7, 1950 report of Special Agent Thomas H. Zoeller) ("Zoeller Report").

Moskowitz contends that Gold's statements contradict the testimony he delivered at her trial. She argues that she could have used the contradictory statements to impeach Gold at trial and that the Government's failure to disclose the allegedly contradictory statements to the defense was unconstitutional. She filed this *coram nobis* petition on August 12, 2014 to overturn her conviction.

3

## LEGAL STANDARD

A *coram nobis* petition is a collateral proceeding through which a court may correct fundamental errors in a prior final judgment.[2] *United States v. Morgan*, 346 U.S. 502, 507-08 (1954). A federal court's authority to grant the writ is conferred by the All Writs Act, 28 U.S.C. § 1651(a). *Denedo*, 556 U.S. at 91; *Porcelli v. United States,* 404 F.3d 157, 158 (2d Cir. 2005). *Coram nobis* functions as a *habeas* analogue for non-custodial aspects of a criminal punishment. *See Kaminski v. United States,* 339 F.3d 84, 89-90 (2d Cir. 2003). Unlike *habeas* relief, *coram nobis* relief "comes after the petitioner has completed [her custodial] sentence and will not be retried; thus, the granting of *coram nobis* normally results in the expungement of the conviction, with no possibility of further proceedings to determine whether the petitioner was guilty of the offense charged." *United States v. Mandanici*, 205 F.3d 519, 532 (2d Cir. 2000).

Like *habeas* relief, *coram nobis* relief lies in tension with the public's interest in finality of judgment. *See Foont v United States*, 93 F.3d 76, 80 (2d Cir. 1996). Unlike with *habeas corpus*, however, a *coram nobis* petitioner is not in custody. The harm to the petitioner is therefore much less and, accordingly, courts are more reluctant to grant relief. *See, e.g.*, *United States v. Osser*, 864 F.2d 1056, 1059 (3d Cir. 1988) ("The interest in finality of judgments is a weighty one that may not be casually disregarded. Where sentences have been served, the finality concept is of an overriding nature, more so than in other forms of collateral review such as *habeas corpus*, where a continuance of confinement could be manifestly unjust."); *United States v. Mandel*, 862 F.2d 1067, 1077 (4th Cir. 1988) ("the burden on a *coram nobis* petitioner is, and properly should be, greater than that placed on a *habeas* petitioner."); *United States v.*

---

[2] *Coram nobis* was originally a common law proceeding "available only to bring before the court factual errors material to the validity and regularity of the legal process itself, such as the defendant's being under age or having died before verdict." *Carlisle v. United States*, 517 U.S. 416, 429 (1996). "In American jurisprudence the precise contours . . . have not been well defined . . . [but] its modern iteration . . . is broader than its common-law predecessor." *United States v. Denedo*, 556 U.S. 904, 910-11 (2009).

*Keane*, 852 F.2d 199, 203 (7th Cir. 1988) (The reason to bend the usual rules of finality is missing when liberty is not at stake."); *United States v. George*, 676 F.3d 249, 254 (1st Cir. 2012) ("The Supreme Court has always envisioned *coram nobis* as strong medicine, not profligately to be dispensed. On the few occasions post-*Morgan* that the Court has commented on *coram nobis*, the Justices have stressed that there will rarely be situations warranting deployment of the writ.").

The Supreme Court has explained that *coram nobis* is an "extraordinary remedy." *United States v. Morgan*, 346 U.S. 502, 511 (1954). It "is not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." *Foont* 93 F.3d at 78 (internal quotations omitted). In the Second Circuit, a successful *coram nobis* petitioner must meet three criteria. First, the petitioner must show that "there are circumstances compelling such action to achieve justice." *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998). She must also show that "sound reasons exist for failure to seek appropriate earlier relief" and, finally, that she "continues to suffer legal consequences from [her] conviction that may be remedied by granting of the writ." *Id.* (internal citations omitted).

## ANALYSIS

Petitioner has failed to demonstrate that her conviction should be overturned. First, Gold's statements to the FBI are not "irreconcilable" with the testimony he gave at Moskowitz's trial, as Petitioner alleges. Gold's comment that he never discussed his espionage activity in Moskowitz's presence, *when he could avoid it*, is not the same as saying that he never discussed it in her presence. The former contains an important qualifier, but Petitioner's brief repeatedly contorts Gold's statement to say the latter. The statement in context merely establishes Gold's distrust of Moskowitz, and the sentences surrounding it indicate that

5

Moskowitz was indeed aware of Gold's espionage activities.[3] And Gold's statement that Gold

related a story to Brothman when Moskowitz left to procure coffee does not contradict his trial

testimony at all. In fact, it corroborates it. Gold stated at trial that "Miriam left once and that was

to go out to a White Tower on Queens Boulevard nearby to get some hamburgers and coffee. . . .

It was when she left that the only part of the conversation where she was not present took place."

Allen Decl. Ex. 1, at 652 (Transcript of *United States v. Abraham Brothman, et al.*, No. 133-106)

("Trial Transcript").

That leaves Gold's statement that he told Brothman "practically nothing in

[Moskowitz's] presence" between dinner at Sunny's of Chinatown and Moskowitz's coffee run

on the night of May 29, 1947, as the only plausible inconsistency Petitioner has identified in the

1,200 page trial transcript and in the huge universe of public records created for her high-profile

prosecution. But regardless of whether the Government would be required to disclose such an

inconsistent statement under today's law,[4] it had no such obligation in 1950. This Court's

language from 1982 is equally applicable today:

> [Moskowitz's trial] antedated *Jencks v. United States*, 353 U.S. 657
> [1957], and the Jencks Act, 18 U.S.C. §3500 (1957), which now
> requires the prosecution to turn over to the defense any statement by
> a witness to the extent that its contents relates to the subject matter
> of the testimony (on direct examination) of the witness. At the time
> of the [Moskowitz trial], however, the applicable rule was that a
> defendant had to establish-usually by cross examination-that a
> witness had theretofore made a signed statement containing a
> material contradiction. Upon such a showing the court would
> examine the statement *in camera*, to determine if it did in fact
> contain such a material contradiction. If it did, the relevant part
> would be turned over to defense counsel for further cross
> examination.

---

[3] The report attributes to Gold a fear that Moskowitz would report him and Brothman out of spite. Gold's concern is
consistent with other evidence that Moskowitz knew of his and Brothman's intent to coordinate their separate
statements.

[4] *See, e.g., Brady v. Maryland*, 373 U.S. 83 (1963) (requiring the Government to disclose to the accused any
favorable material evidence relevant to guilt or punishment); *Giglio v. United States*, 40 U.S. 150 (extending *Brady*
to cover information that can be used to impeach government witnesses).

*In re Alger Hiss*, 542 F. Supp. 973, 989 (S.D.N.Y. 1982) (internal quotations and citations

omitted). Gold's statements would doubtless have been useful to a cross-examiner, but the

Government's failure to produce the statements to the defense 13 years before *Brady v.

Maryland* was not an error at the time, let alone one so fundamental that it rendered the

proceeding irregular.[5] And as courts have routinely held, collateral proceedings for

postconviction relief should generally be reviewed by reference to the law prevailing at the time

the conviction became final. *See Teague v. Lane*, 489 U.S. 288 (1989); *Stringer v. Black*, 503

U.S. 222 (1992) (finding that the rule protects finality, among other interests).

Even if, *arguendo*, the Government erred in withholding Gold's statements from

the defense, it did not make any difference to the outcome of Moskowitz's trial. This is because

the conversation on May 29, 1947 between the time the trio ate dinner and the time Moskowitz

left to buy coffee was just one of many inculpating Moskowitz in the conspiracy to obstruct

justice. Gold testified that Moskowitz broke up an argument between Brothman and Gold on the

way to the train station the following morning, saying that "this was no time for the two of

[them] to fight because a falling out . . . was exactly what the federal authorities wanted.

Transcript at 656-57. He testified that Moskowitz was concerned in July, 1947 that Brothman

was considering changing his story for the grand jury and said "that she was going to try and get

him to stick to the original story." *Id.* at 667. Several days later, Moskowitz credited herself and

a friend with "succeed[ing] in persuading Abe from his desire to . . . change the original story

which he had given the agents of the FBI." *Id.* at 669. And the night before Gold was to testify

before the grand jury, Moskowitz offered "to go home early so that Abe and I would have plenty

---

[5] Even under today's law, the Government's failure to disclose allegedly contradictory statements by a witness
would probably not support a writ of error *coram nobis*. *See Murray v. United States*, 704 F.3d 23, 30 (1st Cir. 2013)
("a showing that material evidence was withheld in a criminal proceeding would not alone be enough to establish
that there was a fundamental error in the conviction, given the extraordinary nature of the writ of *coram nobis*.").

7

of time to match our stories before my appearance before the grand jury the next morning."). *Id.*
at 676. Other more subtle examples of Moskowitz offering her approval to Gold and Brothman
litter the record as well. In sum, whatever doubt Gold's statements might have planted in the
jury's mind regarding the night of May 29, 1947, it would not have affected the ample remaining
evidence against Moskowitz.[6]

Moskowitz has also not provided adequate explanation to excuse her failure to
seek an appropriate remedy earlier. Moskowitz points to the fact that the grand jury testimony
was unsealed in 2008, but this still does not justify her failure to bring this petition for more than
five years after that. Five years may appear trivial against the backdrop of the six elapsed
decades since her conviction, but it is nevertheless a long delay in its own right. Courts in this
Circuit have rejected petitions for delays shorter than Petitioner's. *See Foont v United States*, 93
F.3d 76, (2d Cir. 1996) (five years); *Nordahl v. United States*, 425 Fed. Appx. 35 (2d Cir. 2011)
(unpublished opinion) (three and a half years); *Mastrogiacomo v. United States*, No. 90-cr-545
(KTD), 2011 WL 799741, at *2 (S.D.N.Y. July 16, 2001) (three years).

Finally, Petitioner has also failed to satisfy the third prong of the test for *coram
nobis* relief: that she "continues to suffer legal consequences from [her] conviction that may be
remedied by granting of the writ." *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998);
*United States v. Craig*, 907 F.2d 653, 658 (7th Cir. 1990) ("to be successful, the petitioner needs
to show lingering civil disabilities from his allegedly wrongful conviction."). In this case,
Petitioner asserts that she suffers from legal consequences including loss of standing in the

---

[6] To the extent that Petitioner suggests that Gold's statements to the FBI suggested that Moskowitz lacked
knowledge of Gold's espionage activities or the content of the stories that Brothman and Gold were attempting to
reconcile, I note that such knowledge was not required for a guilty verdict. Moskowitz was convicted of conspiring
to obstruct justice, not of spying or lying to the grand jury herself. Her wrongful conduct was helping to stiffen
Brothman's spine so that he would stick to the story he gave government investigators. She did not need to know the
full contours of Brothman's story or how it may have differed from the story given by Gold in order to accomplish
that.

8

community, pecuniary loss from the fine she paid in the '50s, and her inability to serve on a jury. Reputational harm, however, is clearly insufficient to establish continuing legal consequence. *United States v. Nat'l Plastikwear Fashions, Inc.*, 368 F.2d 845 (2d Cir. 1966) (per curiam) ("desire to be rid of the stigma" is not enough); *United States v. Liffiton*, 159 F.3d 1349 (2d Cir. 1998) (unpublished opinion) ("Reputational harm, standing alone, does not satisfy the continuing legal consequences requirement for obtaining *coram nobis* relief."); *United States v. Osser*, 864 F.2d 1056, 1060 (3d Cir. 1988) ("Damage to reputation is not enough."). And the prospect of recovering a fine paid to the Government is inadequate, too. *See, e.g., United States v. Keane*, 852 F.2d 199, 204 (government's retention of a fine is not a civil disability justifying issuance of the writ because).

That leaves Moskowitz's inability to serve on a jury as Moskowitz's only continuing legal consequence. But Moskowitz does not claim to have pursued jury service and been denied, nor does she evince any intent or desire to serve on a jury. And her difficulty hearing makes it unlikely that she would be able to serve on a jury in the future. Purely speculative harm of this sort is not cognizable for purposes of *coram nobis* relief. *Fleming v. United States*, 146 F.3d 88, 91 (2d Cir. 1998) (petitioner's inability to find employment in certain financial jobs was purely speculative when he could not show that he had sought and been denied licensure or had been so employed in the past). Further, it is worth noting that nearly all felony convictions affect an individual's right to serve on a federal jury until the defendant's civil rights have been restored. 28 U.S.C. § 1865(b)(5). If loss of the right to serve on a jury constituted a civil disability for purposes of the writ, virtually all convictions would qualify and the continuing legal consequence test would be rendered superfluous. That was not the Second Circuit's intent in limiting this "extraordinary" remedy. *Fleming*, 148 F.3d at 91 ("The

9

requirement of continuing legal consequences would lose all force if speculative harms . . . were

sufficient to state a claim for *coram nobis* relief).

## CONCLUSION

Moskowitz has failed to show that the Government erred in withholding Gold's

statements to the FBI. She has also failed to show that the extraordinary remedy of a writ of error

*coram nobis* would be appropriate even if the Government had so erred. Accordingly,

Moskowitz's Petition is denied.

The Clerk shall mark the Petition (Doc. No. 1) terminated, and close the file.

SO ORDERED.

Dated:      December 9, 2014
            New York, New York

                      ALVIN K. HELLERSTEIN
                      United States District Judge